1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY MORRISON,                          No. C 08-5329 MHP (pr)

        Petitioner,               **ORDER DENYING HABEAS
                                            PETITION**

    v.

BEN CURRY, warden,

        Respondent.
_____/

## INTRODUCTION

    Anthony Morrison,  an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the pro se habeas petition.  For the reasons discussed below, the petition will be denied.

## BACKGROUND

    Morrison was convicted in 1983 in San Bernardino County Superior Court of two counts of kidnapping for purposes of robbery, two counts of robbery, eight counts of forced oral copulation in concert, six counts of forcible rape in concert, and two counts of sodomy in concert.  Sentence enhancements related to being armed and personally using a firearm were found true.  The court imposed two concurrent sentences of life in prison with the possibility of parole.  Morrison's habeas petition does not challenge his conviction but instead challenges an August 9, 2006 decision by the Board of Parole Hearings ("BPH") that found him not suitable for parole.  The BPH identified the circumstances of the commitment offense, Morrison's lengthy record of institutional misbehavior, and his inadequate programming as the reasons for finding him unsuitable for parole.

Morrison sought relief in the California courts.  The San Bernardino County Superior Court denied his petition for writ of habeas corpus in a reasoned decision.  The California Court of Appeal and California Supreme Court summarily denied his petitions for writ of habeas corpus.

Morrison then filed his federal petition for writ of habeas corpus.  The court ordered respondent to show cause why the writ should not be granted on some claims and dismissed an Eighth Amendment claim.  Respondent filed an answer and Morrison filed a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.    State Law Standards For Parole For Certain Kidnappers In California

California uses indeterminate life sentences for persons convicted of kidnapping for robbery.  See Cal. Penal Code § 209(b).  Parole is possible on such a sentence.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2281, allows for consideration of a wide range of information in determining suitability, see § 2281(b), and lists circumstances tending to show suitability and circumstances tending to show unsuitability, § 2281(c) and (d).[1]  The regulation also provides that "[t]he panel shall first determine whether a prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a).    The regulations contain a matrix of suggested base

terms for several categories of crimes.  See 15 Cal. Code Regs. § 2282.  For example, for kidnapping for robbery or ransom, the matrix of base terms ranges from the low of 8, 10, or 12 years to a high of 13, 15, or 17 years, depending on some of the facts of the crime.[2]  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  In re Dannenberg, 34 Cal. 4th 1061, 1070-71 (Cal. 2005). Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2282(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in source).   Where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." Id. at 1191 (emphasis in source).

B.     Federal Habeas Relief On Parole Denial Claims

The U. S. Constitution's Due Process Clause does not itself provide state prisoners with a federal right to release on parole.  Hayward v. Marshall, 603 F.3d 546, 562 (9th Cir. 2010) (en banc).  The substantive law of a state might create a right to release on parole, however.  See id. at 555, 559.  Although Hayward purported not to reach the question whether a California's substantive law created a federally protected liberty interest, see id. at 562, later cases from the Ninth Circuit have said or assumed it does.   See Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter of federal law. . . .  By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence'

1  rule, <u>Hayward</u> necessarily held that compliance with the state requirement is mandated by

2  federal law, specifically the Due Process Clause." ); <u>Cooke v. Solis</u>, 606 F.3d 1206, 1213

3  (9th Cir. 2010) ("In <u>Hayward</u>, we held that due process challenges to California courts'

4  application of the 'some evidence' requirement are cognizable on federal habeas review under

5  AEDPA"); <u>id.</u> ("we must examine the nature and scope of the federally enforceable liberty

6  interest created by California's 'some evidence' requirement"); <u>see also</u> <u>Pirtle v. California</u>

7  <u>Board of Prison Terms</u>, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme

8  gives rise to a cognizable liberty interest in release on parole.' <u>McQuillion v. Duncan</u>, 306

9  F.3d 895, 902 (9th Cir 2002).  That liberty interest encompasses the state-created

10  requirement that a parole decision must be supported by 'some evidence' of current

11  dangerousness. <u>Hayward</u> [603 F.3d at 562-63.]")   <u>Hayward</u>'s application and these later

12  cases make it clear that in the Ninth Circuit there is federal habeas relief available under §

13  2254 for California prisoners denied parole without sufficient evidence, although it now

14  appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

15      A federal district court reviewing a California parole decision "must determine

16  'whether the California judicial decision approving the governor's [or the Board's] decision

17  rejecting parole was an 'unreasonable application' of the California 'some evidence'

18  requirement, or was 'based on an unreasonable determination of the facts in light of the

19  evidence.'" <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That

20  requirement was summarized in <u>Hayward</u> as follows:

21      As a matter of California law, "the paramount consideration for both the Board
       and the Governor under the governing statutes is whether the inmate currently
22      poses a threat to public safety."  There must be "some evidence" of such a
       threat, and an aggravated offense "does not, in every case, provide evidence
23      that the inmate is a current threat to public safety."  The prisoner's aggravated
       offense does not establish current dangerousness "unless the record also
24      establishes that something in the prisoner's pre- or post- incarceration history,
       or his or her current demeanor and mental state" supports the inference of
25      dangerousness. [¶]  Thus, in California, the offense of conviction may be
       considered, but the consideration must address the determining factor, "a
26      current threat to public safety."

27  <u>Hayward</u>, 603 F.3d at 562 (footnotes omitted) (quoting <u>Lawrence</u>, 44 Cal. 4th. at 1210, 1213-

28  14); <u>see also</u> <u>Cooke</u>, 606 F.3d at 1216 (describing California's "some evidence"

1   requirement).

2        When a federal court considers a habeas case directed to a parole decision, the

3   "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state

4   courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. §

5   2254(d)(2) for whether the decision was "based on an unreasonable determination of the

6   facts in light of the evidence."  Cooke, 606 F.3d at 1214 (citing Hayward, 603 F.3d at 563).

7   C.   Morrison's Case

8       1.   His Circumstances

9     Commitment offense:   On December 25, 1981, Morrison and three crime partners

10   kidnapped for robbery Ronald Chappell and Lisa Goble, who they found at a gas station.

11       Following the kidnapping, Lisa Goble was repeatedly raped, sodomized and made to
12   orally copulate his crime partner.  She was violated and feared for her life.  At one
        point . . . one of the crime partners stated let's blow this bitch's head off.  She was also
        pistol [whipped].  The kidnap occurred in the city of Upland, and the sexual assaults
13   began immediately in the car and continued in the city of San Bernardino.  The victim
        and Morrison were strangers.

14
15   August 9, 2006 BPH hearing reporter's transcript ("RT") 10.  Goble was taken in the

16   Mustang driven by their assailants and in which Morrison was a passenger.  Chappell was

17   taken separately in a pickup truck.  Goble was sexually assaulted during the car ride.  The car

18   and truck "finally came to a halt in a vacant field in the San Bernardino area.  Ms. Goble was

19   ordered out, stripped of her clothing, and was repeatedly raped, sodomized, and forced to

20   orally copulate her assailants.  While this occurred, [Chappell] was lying face-down on the

21   other side of the Mustang, at gunpoint."  Resp. Exh. 5 at 3.

22       For many years Morrison denied even being present at the crime.  In 2002, after his

23   father died, he finally admitted that he was present.  RT 51.  He admitted at the parole

24   hearing in 2006 that he did force Goble to orally copulate him but denied sodomizing her.

25   RT 15, 17.  And although the victim had stated that, once she was taken out of the car in the

26   field, Morrison "had her oral (sic) copulate him while she was being raped from behind,"

27   Resp. Exh. 5 at 6, Morrison denied taking part in the sexual assaults in the field, RT 11, 59.

28   Also, he denied hitting Goble with a gun and denied robbing her, RT 58, although she had

   stated that Morrison and co-perpetrator Smith took her jewelry, and that it was Morrison who

"became upset" and "pistol-whipped her after she failed to comply adequately with his demands" to orally copulate him. Resp. Exh. 5 at 3.

<u>Prior Criminality</u>: Morrison committed the crimes for which he is now in prison when he was 17 years old.  By that time, he already had a significant juvenile record.  In 1977, when he was 13 years old, he was twice arrested for petty theft and was put on probation.  RT 28.   He also was arrested once or twice for indecent exposure.  RT 22.  On another occasion, he received probation for stealing a purse from an elderly woman.  And on yet another occasion, he was caught with a concealed weapon.  RT 30-31.   His probation officer reported that his performance on probation ranged from "poor to unsatisfactory."  Resp. Exh. 5 at 9.

<u>Post-Incarceration Behavior And Activities</u>: Morrison had a lengthy history of misbehavior in prison.  He had received 17 CDC-115 rule violation reports.  He received CDC-115s in 1984, 1985, 1988 (3 times), 1990 (2 times), 1992, 1993, 1996, 1997, 1998, 2001, 2002, 2003 (2 times), and 2004.  Resp. Exh. 6.  His recent CDC-115s reflected his involvement as a maker and consumer of "Pruno" (i.e., inmate-manufactured alcohol).  He received CDC-115s for possession of inmate manufactured alcohol in 2001, 2002, and 2003; and he received CDC-115s for stealing state food in 2003 and 2004 – food items that apparently were for fermenting.  <u>See id.</u>; RT 45, 46, 71.  He also had received at least 20 CDC-128 counselling memoranda for lesser transgressions of prison rules and regulations.

Morrison had done only very limited programming in prison.  He had completed only one vocation, welding, in his 23 years in the prison system.  He did not want to take any other vocation because his stepfather worked in a job where he could give him a good welding job.  RT 36.   He had made inquiries into a correspondence course to become a mortician, but hadn't embarked on such a program.   He had worked in prison, although he was not working at the time of the hearing.  RT 39.  He had worked in culinary services for a few years until approximately 2004, and before that as a porter.  RT 39-40.

He obtained his GED in 1996.  RT 33.  He took an anger management class.  RT 36.  He received two laudatory chronos for helping other inmates in distress.  RT 44.  He had

1    participated in a Protestant chapel program for five years.  RT 48-49.

2         With regard to substance abuse, there was mixed information.  Morrison said he was

3    not involved with alcohol use any more and had not used drugs except that he had tried

4    marijuana twice as a youth.  RT 40.  He did not consider himself an alcoholic or a drug

5    abuser, and was not under the influence on the day of the kidnapping.  He had participated in

6    A.A. or N.A. in about 1996 and perhaps sporadically thereafter.  He said he was in the

7    program until about two years before the hearing, although there was no documentation of

8    the participation in his record.  RT 41-43.  He said he had signed up and was on a waiting

9    list.  RT 42.  He did not do any independent study while on the waiting list.  Since 2000,

10   Morrison also had received the five CDC-115s noted earlier for alcohol-related misbehavior.

11   See Resp. Exh. 6.

12        Psychological Evaluation: The most recent psychological evaluation for Morrison was

13   done in July 2006 by Dr. Macomber, and was largely favorable.  (Neither party submitted the

14   psychological evaluation to this court.)   According to the commissioner, the doctor listed an

15   Axis II diagnosis of an antisocial personality disorder, improving, RT 45, and noted that

16   Morrison had a significant history of disciplinary offenses but without evidence of violence

17   in them.  RT 45-46.  The doctor opined that, Morrison did not appear to pose any more risk

18   to society than the average citizen in the community and thought there were no significant

19   risk factors for him.  RT 47.

20        A BPH commissioner thought that the psychologist had downplayed the significance

21   of the disciplinary history.  RT 45-46.  As the commissioner saw it, Morrison's CDC-115s

22   may not have been for violence, but were for the kinds of activities that can lead to violence

23   in prison.  The district attorney argued that the psychologist's view that Morrison had

24   accepted responsibility was wrong because Morrison's acceptance of responsibility was

25   "limited acceptance at best."  RT 62.

26        Parole Plans If released on parole, Morrison planned to live with his mother in Los

27   Angeles.  He planned to get a welding job, but had no real job offer.  He had a letter from his

28   niece stating that his sister would let him work in her real estate business, although Morrison

1   had no skills related to real estate, had no details as to what job he would do, and did not

2   know whether he would be compensated.  See RT 53, 72.

3

4        2.     BPH's Decision And State Court Review

5        The BPH determined that Morrison was "not suitable for parole and would pose an

6   unreasonable risk of danger to society or a threat to public safety if released from prison."

7   RT 69.  The BPH relied on the commitment offenses, which were "all carried out in a

8   calculated, cold, cruel and callous manner."  RT 69.  The BPH also determined that the

9   offenses "were carried out in a manner which demonstrates an exceptionally callous

10  disregard for human suffering."  RT 69.  The motive was trivial, especially since the robbery

11  that was the alleged initial motive for kidnapping was accomplished before the many sexual

12  assaults occurred.  RT 70.  The BPH also relied on Morrison's prior criminality, his poor

13  institutional behavior (which the commissioner considered to have "been a disaster prior to

14  the last few years" and showed that Morrison had been "a management problem for 20 years

15  in this institution," RT 70), his limited self-help programming, and the recency of any of his

16  gains.  The BPH encouraged him to do more programming or independent study if

17  programming was not available, to obtain more vocational skills, and to try to obtain some

18  employment plans.

19       The San Bernardino County Superior Court determined that the finding of parole

20  unsuitability was supported by some evidence.  Petition, Exh B.  That court recounted the

21  evidence before the BPH, including the aggravated nature of the commitment offense,

22  Morrison's prior juvenile criminal history and failures on probation, and serious disciplinary

23  history, as well as his accomplishments and favorable psychological evaluation.  The Court

24  explained that, upon review, it "determined that there was ample evidence to justify" the

25  conclusion that he would pose an unreasonable risk of danger to society or threat to public

26  safety if released.  Id. at 2.  The court explained that Morrison "presents as an incredibly

27  callous person who has traumatized an innocent woman and now does not believe he should

28  receive the consequences for such a violent and heinous crime."  Id. at 2-3.

1    The state superior court also rejected his other constitutional claims, including his

2    claim that his counsel was ineffective.  The court found that there was no evidence of

3    ineffective assistance of counsel.  Id. at 3. .

4         3.    Analysis Of Habeas Claims

5    As the last reasoned decision from a state court, the San Bernardino County Superior

6    Court's decision is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501

7    U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

8    The state superior court did not cite the applicable standard or any cases.  However, a

9    state court need not cite to the proper standard to survive federal habeas review.  See

10   generally Early v. Packer, 537 U.S. 3, 6-7 (2002) (per curiam) (failure to cite governing

11   Supreme Court precedent is not in itself grounds for grant of writ).  The state court's

12   determination that Morrison was currently a danger had far more than the necessary some

13   evidence to support it.  Morrison committed this offense when he was only 17 years old, but

14   had already accumulated a notable juvenile criminal history, starting when he was about 13

15   years old, and had performed poorly when on probation for the earlier offenses.  His criminal

16   conduct for which he currently is in prison – the kidnapping, robbery, and sexual assaults –

17   easily qualify as a an offense committed "in an especially heinous, atrocious or cruel

18   manner," 15 Cal. Code Regs. § 2281(c)(1).  He denies several of the specific acts, but the

19   victim's statement provided evidence that he was an integral participant in the sexual assaults

20   on her and that he pistol-whipped her when she didn't satisfy his demands.  Once in prison,

21   his misbehavior continued.  His disciplinary record cannot be characterized as minor or

22   distant in time.  To the contrary, he has received CDC-115s throughout his incarceration.

23   And his five most recent disciplinary write-ups indicate he has an ongoing problem with

24   alcohol.  He had done extremely limited programming in prison.   Although Morrison has

25   declared himself a changed man, there was more than enough evidence in the record to

26   determine that his rehabilitation was only beginning.

27   Morrison argues that the state court erred in finding that he admitted sodomizing the

28   victim.  Traverse, p. 5.  The state court had written: "Petitioner admitted kidnapping the

woman and ordering her to orally copulate his cohorts, but denies any other involvement in the crime.  At an earlier hearing he admitted sodomizing and forcing the woman to orally copulate him."  Petition, Exh. B at 2.  The record before this court does not contain full transcripts from earlier hearings so this court is unable to determine what Morrison did and did not admit to at the earlier hearing.  Morrison submitted a single page of his 2004 hearing transcript on which he denied sodomizing the victim, but at the 2006 hearing confusingly agreed with the commissioner's statement that at the earlier hearing he had said, "I kidnapped here (sic) and she sodomized and oral copulated me."  See RT 15.  Even if Morrison had not admitted that he sodomized the victim, any error in the description made no difference to the outcome:  Morrison was involved in the sexual assaults as described by the victim and (contrary to the state court's determination) did not merely "order[] her to orally copulate his cohorts" but also made her orally copulate him.

The severity of the commitment offense, plus the ongoing institutional misbehavior and very limited signs of rehabilitation provide sufficient evidence to support the conclusion that he presents a current danger if released from prison.  The circumstances identified provided reliable, probative evidence of Morrison's current dangerousness.   The state court's rejection of his petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Morrison therefore is not entitled to federal habeas relief on this claim.

The state superior court's determination that there was no evidence of ineffective assistance of counsel was clearly correct.  This court need not decide whether there is clearly established law that a parole applicant has a right to effective assistance of counsel at a parole suitability hearing because, even assuming that he does, Morrison has shown no ineffectiveness.  In his petition, he argued that counsel had failed to familiarize herself with the laws regarding parole suitability, Petition, p. 9, but does not provide any specifics in support of this conclusory allegation and the transcript itself does not reveal any ignorance of the law by counsel.  He does contend that counsel should have objected to the district attorney and victim making statements in opposition to parole, but does not explain what

basis there was for such an objection – California law specifically allows for this kind of input at a parole suitability hearing. <u>See</u> Cal. Penal Code §§ 3043(b), 3046(c). Morrison also alleges that counsel was ineffective in that she failed to "investigate and present any mitigating evidence," Petition, p. 9, but does not describe what mitigating evidence there was that was not presented at the hearing. Further, because of the factual and prisoner-specific nature of the inquiry made at a parole hearing, almost all of the information would have been available to Morrison more than his counsel. He has not explained why he personally didn't present the information to the BPH or ask his counsel to present it. The claim that he received ineffective assistance of counsel has no merit.

Morrison's equal protection claim has no merit because he has not demonstrated that he was treated differently from other similarly situated prisoners and that the BPH lacked a rational basis for its decision.

His <u>ex post facto</u> claim also has no merit. The law has changed: when Morrison committed his crimes in 1981, California Penal Code § 3041.5 provided for annual parole consideration hearings, and the law was later amended to allow multi-year denials. However, the lengthening of the time period between parole hearings "had no effect on the standards for fixing a prisoner's initial date of 'eligibility' for parole" or for "determining his 'suitability' for parole" and setting his release date; rather, the amendment merely relieved the BPH from the costly and time-consuming responsibility of scheduling annual hearings for prisoners who had no reasonable chance of being released. <u>See</u> <u>California Dep't of Corrections v. Morales</u>, 514 U.S. 499, 514 (1995). The amendment therefore did not violate the <u>Ex Post Facto</u> Clause. <u>See</u> <u>id.</u> at 508-09; <u>cf.</u> <u>Johnson v. Gomez</u>, 92 F.3d 964, 967-68 (9th Cir. 1996) (change in ultimate parole decision-maker did not violate <u>Ex</u> <u>Post</u> <u>Facto</u> Clause where prisoner could only speculate that he would have been released under former version of the law). Because the present petition challenges a 2007 decision wherein parole was denied for two years, the court considers the law as it was then and does not opine on the constitutionality of the more recent changes in California's law that now allow for intervals of up to 15 years between parole hearings.

1

D.      <u>Certificate Of Appealability</u>

2

A certificate of appealability will not issue. <u>See</u> 28 U.S.C. § 2253(c).  This is not a

3

case in which "reasonable jurists would find the district court's assessment of the

4

constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

5

**CONCLUSION**

6

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close

7

the file.

8

IT IS SO ORDERED.

9

DATED: October 28, 2010

_____
Marilyn Hall Patel
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

1

## <u>NOTES</u>

2 1. The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially
3 heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual
4 offense, the prisoner has a lengthy history of severe mental problems related to the offense; and serious misconduct while in prison.  15 Cal. Code Regs. § 2281(c).  The listed
5 circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the
6 prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or
7 developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2281(d).  The circumstances listed as tending to show unsuitability and suitability "are set
8 forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."  15 Cal. Code Regs. §
9 2281(c) and (d).

10 2. One axis of the matrix concerns the kind of harm done to the victim and the other axis of the matrix concerns the circumstances of the kidnapping.  The choices on the axis for the
11 harm to the victim include no/minor harm, victim sexually or otherwise seriously assaulted, victim suffered major injuries, or victim died.  The choices on the axis for the circumstances
12 of the kidnapping are minor movement, extensive movement, victim taken hostage, and intricate prior planning for the crime.  15 Cal. Code Regs. § 2282(c).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14